UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 08-11343-RGS

CLAUDINE BHATTI

v.

TRUSTEES OF BOSTON UNIVERSITY

MEMORANDUM AND ORDER ON DEFENDANTS'
 MOTION FOR SUMMARY JUDGMENT

October 19, 2010

STEARNS, D.J.

The Fifth Circle of Dante's *Inferno* was reserved for the wrathful and the sullen who forever looked out at one another in anger.  So it seems was the daily routine at Boston University (BU) Dental Health Center (Center).  On August 6, 2008, Claudine Bhatti, an African-American dental hygienist employed at the Center brought this hostile environment lawsuit against the Trustees of BU.  The lawsuit alleges race discrimination and retaliation under the federal anti-discrimination laws, Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981.  More specifically, Bhatti alleges that she was singled out for racially disparate treatment after complaining to her supervisors about preferential treatment accorded white coworkers. The Trustees in due course brought a motion for summary judgment.  A hearing on the motion was held on September 14, 2010.

BACKGROUND

The record as seen in the light most favorable to Bhatti as the non-moving party consists of a litany of petty insults, vindictive behavior, and angry recriminations.  Bhatti

was hired at the Center in January of 2003.  The Center, which is an extension of BU's School of Dental Medicine, provides dental services, including x-rays, cleanings, and other dental prophylaxes, to BU staff and students.  The Center employs dentists, hygienists, dental assistants, and laboratory technicians.  Bhatti was one of the Center's five dental hygienists.  Three of her coworkers were white (Anne Jensen, Julie Lidano, and Sally Baldwin), while the other hygienist (Stefanie Charity) was (like Bhatti) black.  The three white hygienists were senior by several years to Bhatti, while Charity was hired the year after Bhatti joined the Center.

When Bhatti was hired, Dr. Eyad Haidar, a practicing dentist, was the Director of the Center.  Jacqueline Needham was the Center's Manager.  Needham, who reported to Dr. Haidar, supervised the hygienists.  During the first two years of Bhatti's employment, the hygienists were classified as salaried "exempt" employees who earned a fixed monthly salary.  As exempt employees, none of the hygienists was paid overtime.  Of particular relevance, hygienists were expected to prepare their work stations prior to their first appointments without any additional pay.  Bhatti alleges that the white hygienists were credited with a half-hour of preparation time as part of their regular work schedule – meaning that unlike Bhatti, they worked a half-hour less each day.  Pl. SOF - Ex. 62 at 2-3; Ex. 64 (MCAD Charge), ¶¶ 14-15; Def. SOF - Ex. 1 at 2.  When Bhatti asked Dr. Haidar why white dental hygienists were given the half-hour of credit and not she, he told her that "the white hygienists had been hired under a different set of policies."[1]

_____

[1]This purported statement of Dr. Haidar's is taken from Bhatti's answers to interrogatories (Def. SOF - Ex. 1), and her letter of complaint to Dr. Haidar (Pl. SOF - Ex. 62).  Bhatti's fellow hygienists do not corroborate the alleged "different set of policies."

In August of 2005, the hygienists were told that a new interpretation of the Fair Labor Standards Act (FLSA) required their reclassification from an "exempt" to a "non-exempt" payroll status.[2]  As a consequence, in addition to their weekly salary, the hygienists would be paid overtime when required to work more than forty hours.  See Def. SOF - Ex. 6 (Bhatti Dep.) at 52-54.   Bhatti alleges that even under this "later version" of the work week, "the three white hygienists were scheduled a shorter workday than their black counterparts."[3]

On March 1, 2005, Bhatti received a raise of $11,500, bringing her total salary to an annual $63,000.  The raise represented a 22.33 percent increase in her pay.  Id. at 50; Ex. 12.  Bhatti also received regular annual raises since beginning work at the Center. She complains, however, that she did not receive "merit" increases in 2005 or 2006.  Id. - Ex. 13.

The hygienists were required to submit written requests for leave and were charged sick or vacation time based on the requests.  Bhatti acknowledges that the leave policy applied to all Center employees, but contends "that this requirement was not uniformly enforced."  Pl. Resp. to Def. SOF ¶ 27.  She claims that she was required to request sick leave and vacation time in writing, but that her white colleagues were not always required

---

[2]In 2005, the United States Department of Labor issued new guidelines governing the classifications for salary and hourly-paid employees under the FLSA.

[3]As support, Bhatti cites a BU document that "as of February 14, 2006" listed each hygienist's schedule from January 2004.  Pl. SOF - Ex. 72.  The document shows Jensen and Baldwin scheduled to work 43.25 total hours per week, and Lidano 41.5 total hours per week (including the 30-minute daily preparation time).  After March of 2004, Baldwin's hours were reduced to 35.25 per week, and she was reclassified as a part-time employee.

to do so.  When Bhatti complained to Needham about the disparate practice, Needham told Bhatti that she was "offended" by her complaint.  In January of 2005, Bhatti took her complaint to Dr. Haidar.  He told her that she would no longer be required to file written requests to leave work ten minutes early.  (Baldwin and Lidano testified that they had been excused from submitting written requests if they left work "15 minutes" early).[4]  Def. SOF - Ex. 14 (Baldwin Dep.) at 19-20; Ex. 16 (Lidano Dep.) at 33-34).   Dr. Haidar refused, however, to compensate Bhatti for any time previously docked.  Prior to January 10, 2005, Bhatti had submitted only one written request for less than one half-hour's leave.  On May 20, 2004, she requested sick leave after she extended her lunch break by twenty minutes.[5]  See Def. SOF - Ex. 20.

On March 3, 2004, Dr. Haidar circulated a memo among Center employees regarding the use of cell phones.  See id. - Ex. 21.  The memo ordered employees to turn off their phones on arriving for work (although they could be reactivated during the lunch break).  Bhatti and two other unnamed Center employees received written reprimands after being observed violating the new cell phone policy.  Id. - Ex. 6 at 31-32, 48-49, 67-68; Ex. 22.

---

[4]Bhatti also alleges that Baldwin customarily left a half-hour early for lunch, but was not charged leave.  Def. SOF - Ex. 6 at 66-67; Pl. SOF - Ex. 65.

[5]On occasion, Bhatti took extended lunch breaks in excess of the one hour allowed Center staff or she asked permission to leave work early. The extra time was charged to her accrued sick time, which is non-compensable, that is, it cannot be converted to cash on termination of employment.  For example, on September 10 and 30, October 26, and November 1 and 3, 2004, Bhatti requested (and was charged for) an hour of sick time after asking to leave an hour before the end of the workday.  See Pl. SOF - Ex. 20.  BU notes that even though Bhatti was not ill, the time was not offset against her accrued (and convertible) vacation time. Def. SOF - Ex. 6 at 43-44; id. - Ex. 20.

4

On August 1, 2005, Bhatti felt ill, but was unable to locate and inform a supervisor. When a patient with a late afternoon appointment was left unattended, Dr. Haidar found Bhatti resting in her dental chair.  He reprimanded Bhatti and told her that she should be looking after her patients.  He refused to listen to her explanation that she had made arrangements with a colleague to see the patient in her stead.  Def. SOF - Ex. 1 at 3-4; Ex. 6 at 61-63.

On August 12, 2005, Bhatti called in sick.  She returned the following day, but without a doctor's note.   The absence was charged to her accrued vacation time (consistent with existing Center policy requiring a medical note for any absence attributed to illness). Def. SOF - Ex. 1 at 4-5; Ex. 6 at 27-28; Ex. 35; Ex. 36.  While Bhatti was aware of the Center's policy, she complains that "the 'one-day medical note' policy did not specify that a vacation day would be deducted as a result."  Pl. Resp. To Def. SOF ¶ 32.  Baldwin, Jensen, and Lidano testified that they provided doctors' notes for their one-day absences. (Lidano testified that no one ever "haunted" her for the note.  Def. SOF - Ex. 69 at 38-40).

On September 7, 2005, Bhatti met with Dr. Haidar and Needham to discuss "performance issues," specifically, the undocumented August 1 illness, Bhatti's failure to produce a doctor's note for the August 12 absence, and her use of a cell phone during working hours.  Bhatti submitted a written response to the bill of "issues."  She clarified the events of August 1, 2005, insisting she had never left the facility during the day, and that any claim to the contrary was false.  Bhatti acknowledged that she had stayed out sick on

August 12 without providing a doctor's note.[6]  However, she pointed out that she did not

abuse her sick days, but had accrued over thirty unused sick days in her two and one- half

years of employment.  She also denied ever having received the memo regarding the cell

phone policy.  Bhatti stated that she only used her cell phone in emergencies involving her

children or husband.  Def. SOF - Ex. 1 at 5-6; Ex. 6 at 63; Ex. 23; Ex. 24; Ex. 34; Ex. 37;

Ex. 38.

In responding to Bhatti's submission, Dr. Haidar raised another issue that had been

aired at the September 7, 2005 meeting – that Bhatti had made an allegedly "derogatory

remark" to Needham about Yu-Wen Szeto, one of her co-workers.  Dr. Haidar claimed that

the remark had been made in an open hallway where it could have been overheard by

patients and fellow employees.  <u>See</u> Def. SOF - Ex. 37.  Bhatti recounted her version of

events for Dr. Haidar.  According to Bhatti, Needham had informed Bhatti that she had

been docked two hours pay because Szeto had reported her for leaving the Center early

on August 1, 2005.  Bhatti responded, "That is a lie."[7]  Bhatti denies that the statement was

intended as a personal attack against Szeto.

On September 26, 2005, Bhatti met with Dr. Haidar, Valerie Denomy – a Dean's

Office representative – and George Snowdon, an officer of BU's Office of Human

---

[6]Dr. Margaret Errante, Dr. Haidar's eventual replacement, instituted a three-day medical note policy, consistent with BU's general practice.  <u>See</u> Pl. SOF - Ex. 66 (Errante Dep.) at 87-88.

[7]Bhatti states that she had asked Haidar, "What was the derogatory remark?" and "What patients and fellow employees heard it?"  His response was that, "I didn't say that anyone heard anything. I simply said if anyone was standing around, they could have heard."  Pl. SOF ¶ 63.

Resources.  Bhatti confronted Dr. Haidar about the Szeto incident and the allegation that she had left one of her patients untreated on August 1, 2005.  Bhatti presented Snowdon with a letter from the patient's mother stating that her son had missed his appointment with Bhatti that day.  <u>See</u> Pl. SOF - Ex. 75.  Upon being shown the letter, Dr. Haidar exclaimed, "What a low-down trick."  Snowdon asked Dr. Haidar to remove his accusatory letter from Bhatti's file.  Dr. Haidar refused and said, "I wish to revise it instead."  Snowdon listened to Bhatti's concerns and advised her to file a complaint with BU's Office of Equal Opportunity and Affirmative Action (OEOAA).

On November 1, 2005, Bhatti filed charges with the Massachusetts Commission Against Discrimination (MCAD) and the Equal Employment Opportunity Commission. Bhatti also met with Kim Randall, the Director of BU's OEOAA.  Bhatti complained to Randall regarding the treatment she had received from Dr. Haidar and Needham regarding her work hours, her cell phone use, her leave requests, and "the absence of a consistent assigned room like the white hygienists had, and being required to relocate on demand, . . . and the manner in which Dr. Haidar spoke to [her]."  Randall wrote a report dated November 28, 2005, following her investigation of Bhatti's complaints, finding no evidence of racial discrimination.  Def. SOF - Ex. 18.

On November 30, 2005, Bhatti wrote to Dr. Haidar "requesting that she be given the twenty-two sick days that should have been provided to her upon her hire pursuant to BU's personnel policies."  Pl. SOF ¶ 16.  <u>See</u> <u>also</u> <u>id</u>. -  Ex. 63.  BU's Office of Human Resources agreed with Bhatti.  Dr. Haidar wrote back to Bhatti confirming that she (and three other unidentified employees) would be credited with additional sick days.  <u>See</u> Def.

7

SOF - Ex. 28, Ex. 29.  In January of 2006, Bhatti was credited with twenty-two extra days of sick leave.

On December 9, 2005, Bhatti began seeing a therapist with complaints of anxiety and depression, which she attributed to workplace stress.  Bhatti told the therapist that she felt "disrespected" by her supervisors, that she had been accused of unprofessional conduct, and that "the amount of time she takes off is scrutinized as well as the things she does. . . . [and that she] [c]ontinues to feel victimized by her boss."  Def. SOF - Ex. 6 at 104-108; Ex. 30.  However, on January 23, 2006, the therapist declined to endorse Bhatti's request for leave under the Family and Medical Leave Act, stating that she "does not have a serious medical condition."  See id. - Ex. 31.

On February 1, 2006, Bhatti was given a permanent operatory from which to work. According to Dr. Haidar, permanent room assignments were made based on the hygienists' seniority.  Def. SOF - Ex. 6 at 75-76.

On June 22, 2006, Dr. Haidar issued  a written reprimand to Bhatti for "lack of cooperation and insubordination on June 19, 2006."  On that day, Bhatti refused to rearrange her lunch hour to see a patient because of a scheduling error, even though Dr. Haidar offered to pay her overtime.  Id. - Ex. 1 at 10-11; Ex. 6 at 89-90; Ex. 39; Ex. 40. Bhatti states that she initially refused to treat the patient because there was insufficient time to do so adequately.  "Regardless Bhatti actually treated the patient within the allotted time."  Pl. Resp. to Def. SOF ¶ 36.

On July 1, 2006, Dr. Errante replaced Dr. Haidar as Director of the Center. Subsequently, Bhatti told her therapist that "some positive changes within her job [have]

8

decreased some of her stress." Id.  However, Dr. Errante refused to pay Bhatti for fifteen

minutes of overtime that she worked on August 21, 2006, because she did not feel that

there was any need for Bhatti to work overtime on that day.[8]  By the Fall of 2006, Bhatti

had ceased taking antidepressant medication and told her therapist that her "[a]nxiety

[level was] low.  Boss at work who was giving her trouble has left and new boss treats her

better."  Ex. 6 at 109.  See also Ex. 32.  However, according to Bhatti, Needham continued

to "question other staff about [her] departure times."

Needham, Bhatti's direct supervisor, was terminated by BU in March of 2008.  BU

notes that

> [v]irtually every employee who reported to Needham, found her "difficult to
> work with."  She was variously perceived to be "mean," "generally not a nice
> person," who "treated people equally disrespectfully, except patients." White
> hygienists thought Ms. Needham did not treat them fairly, and that she
> "rubbed other people the wrong way, not just me."  Ms. Needham was
> perceived to "act unprofessionally" and "treated [people] disrespectfully."
> Plaintiff acknowledged that most people thought Ms. Needham was "harsh,"
> "unfair," "occasionally nasty," "singled out people," "was not a good
> manager," and that "many people were afraid of her."  Even Ms. Needham's
> direct supervisor, Dr. Haidar, the Director of the Center, felt that "sometimes
> [Ms. Needham] might be a little bit too harsh with employees.'"  Dr. Haidar
> characterized Ms. Needham's style as "management by fear."

Def. SOF - Ex. 3 at 26, 31.  See also id. - Ex. 4 at 106-108; Ex. 6 at 37-38; Ex. 14 at 73-76;

Ex. 15 at 104-106; Ex. 16 at 51-54; Ex. 17; Ex. 18.

On August 6, 2008, Bhatti filed this lawsuit, asserting claims for discrimination and

retaliation.  Count I alleges discrimination in violation of Title VII of the Civil Rights Act of

1964, 42 U.S.C., § 2000e, et seq.  Count II asserts a retaliation claim under Title VII.

---

[8]Bhatti contends that "Needham, who was still the office manager, was behind this."
See Pl. SOF ¶ 7.  See also Def. SOF - Ex. 1 at 12-14; Pl. SOF - Ex. 56, Ex. 57.

Count III alleges discrimination and retaliation under 42 U.S.C. § 1981.  Bhatti alleges that she was treated disparately because of her race, and then was retaliated against after she complained to Needham and Dr. Haidar.  Bhatti contends that her work was subject to niggling scrutiny and that she was selected for unjustified and baseless disciplinary actions, including the unilateral enforcement of workplace rules.  Bhatti states that the alleged disparate treatment ended after June 30, 2006, when Dr. Haidar was replaced as the Director of the Center by Dr. Errante.  Bhatti further states that her disagreements with Center management under Dr. Errante's stewardship have been business disputes, or the result of "bad management," and not the result of discrimination.  Def. SOF - Ex. 3 at 17; Ex. 6 at 77-78, 90-95.

DISCUSSION

A district court grants summary judgment only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).  See also Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000). "Even in employment discrimination cases where elusive concepts such as motive or intent are at issue, this standard compels summary judgment if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 5 (1st Cir. 2000), quoting Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

Where a plaintiff, as here, fails to offer direct evidence of discrimination, a district

10

court is to apply the burden-shifting analysis articulated by the Supreme Court in St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993), Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-253 (1981), and McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802. See also Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 33 (1st Cir. 2001).  If the plaintiff produces competent evidence establishing a prima facie claim of discrimination, the defendant must then articulate "a legitimate, non-discriminatory reason for its adverse employment action." Id., quoting McDonnell Douglas, 411 U.S. at 802.  Plaintiff must, at the end of the day, identify enough admissible evidence to "support a [rational] finding that unlawful discrimination was not the cause of the employment action." Hicks, 509 U.S. at 507.  "At the summary judgment stage, the plaintiff 'must produce evidence to create a genuine issue of fact with respect to two points: whether the employer's articulated reason for its adverse decision was a pretext and whether the real reason was discrimination.'" Quinones v. Buick, 436 F.3d 284, 289-290 (1st Cir. 2006), quoting Thomas v. Eastman Kodak Co., 183 F.3d 38, 62 (1st Cir. 1999). See also Fennell v. First Step Designs, Ltd., 83 F.3d 526, 535 (1st Cir. 1996) ("On summary judgment, . . . a court may often dispense with strict attention to the burden-shifting framework, focusing instead on whether the evidence as a whole is sufficient to make out a jury question as to pretext and discriminatory animus.").  Section 1981 race discrimination claims are analyzed using the same framework. See Conward v. Cambridge Sch. Comm., 171 F.3d 12, 18-19 (1st Cir. 1999).

Discrimination under Title VII or Section 1981

To establish a prima facie case of disparate treatment based on race, Bhatti must

11

show that: (1) she is a member of a protected class; (2) she was qualified for her position; (3) her employer took an adverse employment action against her; and (4) the position remained open or was filled with someone else with similar qualifications. See Prescott v. Higgins, 538 F.3d 32, 40 (1st Cir. 2008); Kosereis v. Rhode Island, 331 F.3d 207, 212-213 (1st Cir. 2003).

In her answers to interrogatories, Bhatti specifies the following the acts of alleged discrimination by BU:

(a)  Plaintiff was instructed to arrive half an hour before her first patient arrived in order to set up her room, and claims that, unlike her white colleagues, she was not compensated for this time. Ex. 1 at 2.

(b)  Plaintiff was required to submit written requests for time off, and her accumulated sick or vacation leave was reduced accordingly. She believes her white colleagues were not required to submit written requests for time off. Ex. 1 at 2.

(c)  On January 10, 2005, Plaintiff "met with Dr. Haidar regarding disparate treatment concerning the need for her to submit requests for time off and having to use sick or vacation time when she needed to leave early or take time off during the day." Dr. Haidar told Plaintiff she did not have to fill out a Leave Request Form if she was leaving a few minutes earlier than usual, but refused to compensate her for time that had previously been docked. Ex. 1 at 3.

(d)  On August 1, 2005, Dr. Haidar criticized Plaintiff, who was resting while temporarily ill, for failing to treat her patient. But Plaintiff had made arrangements with a colleague to care for that patient, who never appeared for his appointment. Nonetheless, Plaintiff was charged with two hours of sick leave for allegedly leaving early. Ex. 1 at 4.

(e)  Plaintiff's accumulated vacation time was reduced by one day when, on August 12, 2005, she called in sick but did not produce a doctor's note to explain her absence, as Center policy requires. Ex. 1 at 4-5.

(f)  A September 7, 2005 letter from Dr. Haidar to Plaintiff describing "three performance issues" was "false and misleading." Ex. 1 at 5.

12

(g)   In September 2005, Plaintiff was unjustly accused of making a "derogatory remark" about a colleague. Ex. 1 at 6.

(h)  On October 21, 2005, Plaintiff was improperly accused of (1) dismissing a patient without an examination by a dentist; (2) failing to give a copy of an Approved Absence Request Form to the front desk; and (3) violating the Center's prohibition on using cell phones on October 20, 2005. Together, these charges represent "undue scrutiny, unwarranted criticism and ongoing harassment and retaliation." Ex. 1 at 9.

(i)  On June 22, 2006, Dr. Haidar issued a letter of reprimand to Plaintiff for failing to cooperate with regard to a scheduling change. Ex. 39.

(j)  When Plaintiff requested time off in October 2007 to take medication to her daughter, who was ill, Ms. Needham told her that the time would be taken from her accrued vacation time. Dr. Margaret Errante, the Director (who had replaced Dr. Haidar sixteen months earlier), instructed that the time should be taken from Plaintiff's accumulated sick leave instead. Ex. 1 at 12.

Def. SOF - Ex. 1.

Bhatti is a member of a protected class (African Americans).  Her qualifications as a hygienist are not in dispute.  The stumbling block is at the third element of Bhatti's prima facie case.  She alleges numerous instances of rude, abrupt, and ill-tempered treatment by Haidar and Needham, many related to the strict enforcement of workplace rules that Bhatti regarded, often fairly it seems, as rigid and arbitrary.  However, she offers no evidence that in policing the workplace her supervisors (particularly Needham) "treated [her] misconduct differently (i.e. more harshly) than comparable misconduct of other, similarly situated [white employees]."  Conward, 171 F.3d at 19.  "In a disparate treatment case, the plaintiff has the burden of showing that she was treated differently from 'persons similarly situated in all relevant aspects.'"  Smith v. Stratus Computer, Inc., 40 F.3d 11, 17

13

(1st Cir. 1994).  The test is whether a "prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated. . . . Exact correlation is neither likely nor necessary, but the cases must be fair congeners.  In other words, apples should be compared to apples." Dartmouth Review v. Dartmouth Coll., 889 F.2d 13, 19 (1st Cir. 1989), overruled on other grounds by Educadores Puertorriquenos en Accion v. Hernandez, 367 F.3d 61 (1st Cir. 2004).  See also Mitchell v. Toledo Hosp., 964 F.2d 577, 582 (6th Cir. 1991).  By all accounts, Needham treated all of her employees with the same unmodulated harshness and insensitivity.

There is one allegation of disparate treatment raised by Bhatti that gives some pause.  Bhatti contends that she was required to work a half-hour longer each day than her white co-workers, essentially from January of 2003 until the FLSA reclassification took place in August of 2005.  See Def. SOF - Ex. 6 at 55; Ex. 64 ¶ 14-15.  Bhatti claims that when she confronted Haidar about the disparity, he told her that the more senior white hygienists were hired under "different policies."  Haidar testified at his deposition that he did not investigate the truth of Bhatti's complaint, but agreed that if she was required to work thirty minutes longer than anyone else, "that would be unfair." Def. SOF - Ex. 3 at 158-159.

BU responds that there is no evidence to support Bhatti's assertion – the only documents that Bhatti has produced are time records from the year 2000, which predate her hiring by three years.  Moreover, the few records that have been located that reference the white hygienists' weekly hours show them working the same hours as Bhatti.  BU also offers the testimony of Baldwin that she "seldom left early, because either patients arrived

14

for their appointments or she stayed until the end of the day to assist her colleagues." Def. Resp. to Pl. SOF ¶ 40.   BU adds that several of Bhatti's colleagues worked part-time for less than 40 hours a week, which skews Bhatti's calculation of disparate treatment by comparing apples and pineapples.   If Bhatti in fact worked a longer day, there is no evidence that she was assigned more "chair" time because of it, or that her pay was in any way affected.

Assuming, nonetheless, that an unadorned snippet of self-serving testimony is sufficient to place the length of Bhatti's workday in dispute, she offers no evidence (as she must) that the longer work hours can be explained by a discriminatory animus on Haidar's (or Needham's) part, as opposed to simple bad management.   See Coyne v. City of Somerville, 972 F.2d 440, 444 (1st Cir. 1992) ("A plaintiff 'may not prevail simply by asserting an inequity and tacking on the self-serving conclusion that the defendant was motivated by a discriminatory animus.'").   While federal law prohibits discrimination, it does not impose a general civility code for the workplace.   See Quiles-Quiles v. Henderson, 439 F.3d 1, 7-8 (1st Cir. 2006), quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998).   See also Sweeney v. West, 149 F.3d 556, 557 (7th Cir. 1998) (the "definition of adverse employment action . . . [cannot] include reprimands . . . absent some tangible job consequence.").

Retaliation

To make out a prima facie case of retaliation, Bhatti must show that: (1) she engaged in a protected activity; (2) she suffered some materially adverse action; and (3) the adverse action was causally linked to her protected activity.   See Prescott, 538 F.3d

at 43.  "The alleged retaliatory action must be material, producing a significant, not trivial, harm. Trivial actions such as 'petty slights, minor annoyances, and simple lack of good manners will not [normally] create such deterrence.'" Carmona-Rivera v. Puerto Rico, 464 F.3d 14, 20 (1st Cir. 2006) (internal citations omitted).  It "must materially change the conditions of plaintiff's employ." Gu v. Boston Police Dep't, 312 F.3d 6, 14 (1st Cir. 2002). "Materially adverse" means the action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006), quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006).  The test for whether an adverse action is material or produces significant harm is "objective."  Id. at 69-70.

Bhatti asserts that "she was singled out for disparate and discriminatory treatment following her complaints regarding the wage and hour issues [in a January 7, 2005 meeting]." Pl. SOF ¶ 52.  Bhatti alleges that she first complained directly to Haidar about "white hygienists being paid for prep time" at their September 9, 2005 meeting. Def. SOF - Ex. 6 at 55; Pl. SOF - Ex. 64 ¶¶ 14-15.  However, after this meeting, no "materially adverse result" followed.  The undisputed evidence is that Bhatti was given a permanent operatory, suffered no adverse change in her hours, and continued her employment uninterrupted at the Center (where she still works today).

Hostile Work Environment

The elements of a hostile racial environment claim under Section 1981 are identical to those under Title VII.  A plaintiff must establish: (1) that she is a member of a protected class; (2) that she was subjected to unwelcome harassment; (3) that the harassment was

16

based on her race; (4) that the harassment was sufficiently severe or pervasive so as to alter the terms or conditions of her employment; (5) that the conduct complained of was both objectively and subjectively offensive; and (6) that some basis for employer liability has been established.  Prescott, 538 F.3d at 41.

> [W]hether an environment is "hostile" or "abusive" can be determined only by looking at all of the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. . . . [W]hile psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

Harris v. Forklift Sys., 510 U.S. 17, 23 (1993).  With regard to this claim, BU offers non-discriminatory reasons to counter each of Bhatti's complaints, specifically that Needham was equally unpleasant to all employees and that Haidar had legitimate reasons to question Bhatti's performance.  "Work places are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action."  Bishop v. Bell Atl. Co., 299 F.3d 53, 58-59 (1st Cir. 2002), quoting Blackie v. Maine, 75 F.3d 716, 725 (1st Cir. 1996).  See also Conto v. Concord Hosp., Inc., 265 F.3d 79, 81 (1st Cir. 2001) (affirming grant of summary judgment on hostile work environment claim where plaintiff did not show that defendant's conduct unreasonably interfered with her work performance); McKenzie v. Potter, 2004 WL 1932766, at *7 (D. Mass. Aug. 20, 2004) (plaintiff's conclusory allegations that harassing conduct was gender-based were insufficient to withstand summary judgment).  Bhatti's claim of a hostile work environment, like the claim of retaliation, necessarily fails for want of evidence of an adverse employment action, real

17

or plausibly perceived.

ORDER

For the foregoing reasons, the Trustees' motion for summary judgment is

ALLOWED.  The Clerk will enter judgment for the Trustees and close the case.

SO ORDERED.

s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE